**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**


MARYE DUNBAR and )
CHARLES DUNBAR, )
           )
         Plaintiffs, )
           )    Case No. 10-CV-330-GKF-TLW
v. )
           )
STATE FARM MUTUAL AUTOMOBILE )
INSURANCE COMPANY, )
           )
         Defendant. )


**<u>OPINION AND ORDER</u>**

Before the court is the Motion for Summary Judgment [Dkt. #56] of defendant State

Farm Mutual Automobile Insurance Company ("State Farm"). Plaintiffs Marye and Charles

Dunbar filed suit in Tulsa County District Court on April 30, 2010, asserting claims for breach of

contract and breach of the implied duty of good faith and fair dealing. [Dkt. #2-1, Petition]. On

May 24, 2010, State Farm removed the case to federal court based on diversity jurisdiction.

This lawsuit arises from a claim the Dunbars submitted to State Farm on their

underinsured motorist ("UIM") insurance policy. The UIM claim, in turn, arose from a

pedestrian/automobile accident in which Mrs. Dunbar was struck by a driver who carried liability

insurance with a $100,000 limit, which was ultimately paid in full to the Dunbars by the driver's

insurer.

On April 15, 2009, Mrs. Dunbar, then 87 years of age, was walking on a residential street

in Tulsa when she was struck by an automobile backing out of a driveway. She fell to the

1

ground, breaking her pelvis and suffering other injuries. [Dkt. #2-1, Petition, ¶5; Dkt. #2-2, Answer, ¶5]. The negligence of the driver was the direct cause of the accident. [Petition, ¶6; Answer, ¶5]. Mrs. Dunbar incurred $53,000 in medical bills over the following months as a result of the accident. [Petition, ¶6; Answer, ¶6].

In their bad faith claim, plaintiffs allege State farm failed to (1) properly investigate the nature and extent of Mrs. Dunbar's injuries; (2) make a prompt payment on the claim; (3) make any settlement offer to Mr. Dunbar; and (4) properly evaluate plaintiffs' damages. [Dkt. #56, Defendant's Statement of Material Facts, ¶4; #58, Plaintiffs' Response to Defendant's Statement of Material Facts, ¶4].

In its summary judgment motion, State Farm asserts plaintiffs have no claim for breach of contract because the entire $200,000 in UIM policy limits have paid, and have no bad faith claim because the undisputed facts show that State Farm investigated the UIM claim reasonably and had an ongoing legitimate dispute concerning coverage.

## I. Material Facts

The Dunbars had two State Farm insurance policies providing them with a potential maximum of uninsured/underinsured motorist coverage in the amount of $200,000 per person/$200,000 per accident. [Petition, ¶8; Answer, ¶8; Dkt. #56, Ex. 1, UIM Policy]. Under the terms of the policy, plaintiffs, collectively, can recover no more $200,000, because Mr. Dunbar's claim for loss of consortium is derivative of Mrs. Dunbar's claim. [*Id.*]. The UIM policies both state:

2. The most *we* will pay will be the lesser of:

    a. The amount by which the *insured's* damages for *bodily injury* exceed the amount paid to the *insured* by or for any *person* or organization

who is or may be held legally liable for *bodily injury*; or

    b.  The limits of this coverage.

[Ex. 2, UIM Policy at p. 14]. As set forth in the following chronology of relevant facts, State Farm received notice on December 16, 2009, that the tortfeasor's insurance carrier, USAA, had tendered its liability limits of $100,000.

Mrs. Dunbar initiated a claim with State Farm for Medical Payments coverage on or about May 14, 2009. [Dkt. #56, Ex. 2, Claim Activity Log, p. 56]. At his request, Mr. Dunbar personally met with a State Farm medical payments claims adjuster to discuss the Dunbars' automobile insurance coverage on June 2, 2009. That adjuster requested a UIM claim be opened that same day, and State Farm assigned Hali Goss as the UIM adjuster. [*Id.,* p. 53]. Goss immediately performed an initial assignment review of Mrs. Dunbar's accident, estimating her hip surgery would cost approximately $25,000-$40,000, and noting the tortfeasor had limits up to $100,000 in available underlying liability insurance. [*Id.*, p. 52].

State Farm sent out bills and records requests to Mrs. Dunbar's medical providers on June 4, 2009. Once those records were obtained, and after Mrs. Dunbar had a follow-up visit with her physician in July 2009, Goss performed an initial evaluation of the UIM claim on July 23, 2009. [*Id.*, pp. 43-44]. In the initial evaluation, Goss listed medical expenses at $45,840.86, and estimated Mrs. Dunbar's non-economic damages at $40,000-$50,000, for a total estimated range of $85,840.86-$95,840.00. [*Id.,* p. 44]. This range was below the $100,000 in available liability insurance from the tortfeasor.

Goss received additional bills from St. John's Medical Center for Mrs. Dunbar's rehabilitation and factored those into her evaluation on August 24, 2009. With the added medical expenses, Goss's estimate of Mrs. Dunbar's total claim was in the range of $87,614.36-

$97,614.36, still under the $100,000 in policy limits available from the tortfeasor's liability insurer. [*Id.,* pp. 40-41].

Goss called Mrs. Dunbar on September 8, 2009, to speak with her about her medical treatment. Goss testified that during the call, Mrs. Dunbar stated "she was out of the walker, [and] had completed her physical therapy…[at] St. John outpatient physical therapy." [Dkt. #56, Ex. 3, Hali Goss Dep., 91:22:92:24]. Additionally, Mrs. Dunbar told Goss she had a follow-up appointment scheduled for October 26 with Dr. Chalkin's assistant and that she was back to her volunteer work at Meals on Wheels. [*Id.,* 92:24-93:2]. Goss testified that based on this conversation and Mrs. Dunbar's medical records, she believed Mrs. Dunbar had resumed her pre-accident activities. [*Id.,* 99:17-100:10].

After the phone call on September 8, 2009, Goss re-evaluated Mrs. Dunbar's claim and, based on the additional medical bills, evaluated the claim as being in the range of $91,372.36-$101,372.36. [Dkt. #56, Ex. 2, Claim Activity Log, pp. 36-37]. In a note in the Activity Log on September 8, 2009, Goss's supervisor, Jason Taylor commented:

> Hali,
>
> I am not completely certain this is a case of 100% negligence against V2D. This loss occurred in the street vs. hitting a pedestrian on a sidewalk. Why did Ms. Dunbar not see a vehicle backing with backup lights on? She was in the street as a pedestrian. I am not certain she had a greater right to be there then [sic] a car? Do we know why the other car stopped? Could they tell an accident was about to happen?
>
> I think we are past investigating comparative fault at this point. My observations are more for your use for the future.
>
> You are approaching a Burch breach, assuming your ROV is stabilized and not subject to going down. Handle accordingly if your ROV surpasses the amount of liability coverage.
>
> Continue your investigation/evaluation.

[Dkt. #58, Ex. 2, Claim Activity Log, p. 38].[1]

Goss received a conditional lien for $11,584.66 from Medicare on September 14, 2009. The "condition" attached to the lien was that Mrs. Dunbar was still receiving medical treatment and, therefore, the lien was not final. [*Id.,* p. 35].

State Farm learned from Mr. Dunbar on November 18, 2009, that Mrs. Dunbar had completed her physical therapy, but "still had a pretty severe limp." Goss asked the Dunbars to provide an updated medical authorization for State Farm to obtain her medical records from the physical therapy sessions. [*Id.,* p. 31].

On December 16, 2009, State Farm received a letter of representation from Mrs. Dunbar's attorney, Mark Lyons. [Dkt. #56, Ex. 4, Lyons Letter of Representation]. The letter identified "Mary DUNBAR" as "My Client." [*Id.*]. The letter requested that State Farm "tender its UM limits of $100,000 for each policy of Charles and Marye Dunbar totaling $200,000 of stackable UM coverage." [*Id.*]. The Lyons letter attached a copy of the letter to him from USAA advising him USAA had offered Mrs. Dunbar the $100,000 limit of its liability policy coverage on November 4, 2009. [*Id.*]

After receiving additional medical records in January 2010, Goss re-evaluated the claim on January 20, 2010, to a range of $101,372.36-$126,372.36. [Dkt. #56, Claim Activity Log, p. 23]. Also on January 20, 2010, State Farm waived in writing its subrogation rights. [*Id.*]. Goss

---

[1] Plaintiffs assert, "[Goss's] supervisor, Jason Taylor, had to warn her, on August 9, 2009, that her efforts to apportion fault to Mrs. Dunbar from this wreck 'was approaching a *Burch* violation.'" [Dkt. #58 at 6.]. As can be seen from a complete reading of Taylor's note, this is a misstatement of the record. It is clear that—rather than chastising Goss for attempting to assign blame to Mrs. Dunbar—Taylor was advising her she *should* have considered doing so. Further, his reference to a "*Burch* breach" was a recognition that the undisputed starting amount of Goss's range of evaluation ($91,372.36) was approaching the tortfeasor's liability limits of $100,000. When the starting amount on Goss's range of evaluation first exceeded the tortfeasor's liability limits on January 2, 2010, it is undisputed that State Farm offered $2,500, an amount within its evaluation range.

received settlement authority up to $26,272.36 on January 25, 2010. [*Id.*]. Goss testified that

January 20, 2010, was the first time her evaluation range exceeded the amount of coverage

USAA had available. [Dkt. #56, Ex. 3, Goss Dep., 73:4-74:21]. The same day, Goss called

Lyons and offered to pay $2,500 on the UIM Claim. [Dkt. #56, Ex. 2, Claim Activity Log, p.

22]. Goss received a return call from Lyons shortly thereafter. The activity log states:

> Call from Atty wanting to know how I got to my $2500 offer. He said that
> everything that was done in this case from the beginning to end could be
> analyzed in the context of good faith dealing. I started to go over my E with
> him and he interrupted me when I got to where the records to tell me what I
> have done wrong with my investigation. He went on to tell me that I have a
> job that I know well is restricted to what he sent me. Told him I would like
> to get their recorded statements and re-evalute [sic]. Agreed to try to get it
> next week. He will call back re date/time.

[*Id.*]. Lyons sent a letter to State Farm on February 5, 2010, reiterating the Dunbars' demand

that State Farm pay the $200,000 limits on the UIM coverage. [Dkt #56, Ex. 5, Lyons 2/5/10

Letter]. In the letter, Lyons identified "Charles and Marye DUNBAR" as "My Clients," and

stated for the first time that he was also representing Mr. Dunbar and making a loss of

consortium claim on his behalf. [*Id.*]. Lyons also explained why the Dunbars believed Mrs.

Dunbar had not fully resumed her pre-accident activities. [*Id.*].

On February 10, 2010, Goss took the Dunbars' recorded statements. [Dkt. #56, Ex. 2,

Claim Activity Log, pp. 16-21]. The Claim Activity Log reflects that Mr. Dunbar was asked

about his claim for loss of consortium and Mrs. Dunbar's post-accident activities. [*Id.*].

According to the log, Goss and Lyons agreed they would both try to get updated records to show

ongoing pain issues. [*Id., p. 16*].

Goss received the additional medical records on February 17, 2010. [*Id., p. 15*]. On

February 18, 2010, State Farm confirmed with the Dunbars and their insurance agent that all bills

had been paid. [*Id.*].

On March 1, 2010, State farm increased its evaluation to a range of $101,372.36-$151,372.36. [*Id.,* p. 15].  On March 3, 2010, State Farm's evaluation was again increased, this time to a range of $126,372.36 to $176,372.36.  [*Id.,* p. 13].  Goss testified this evaluation factored in compensation for Mr. Dunbar's loss of consortium claim and additional damages for Mrs. Dunbar which did not appear to be accurately reflected in the medical records.  [Dkt. #56, Ex. 3, Goss Dep., 117:6-18].  State Farm's evaluation did not include any estimate of future medical costs because the Dunbars had not provided any documentation regarding ongoing medical costs, and none of the medical providers had scheduled any follow-up treatment.  [*Id.,* 174:5-19].

Goss also contacted Lyons' office on March 3, 2010, spoke with an attorney in his office (John Hare) and offered to settle the UIM policy claim for $27,000.  [*Id.,* p. 13].  Lyons called Goss back and told her he needed written explanations for all information in his February 5, 2010, letter and all documents supporting both offers.  [*Id.*].[2]

Goss sent a letter to Lyons on March 15, 2010, which reiterated State Farm's offer of $27,000 to settle the UIM claim.  [*Id.,* p. 11].  On April 8, 2010, having received no response, Goss contacted Lyons and asked if the Dunbars would make any counteroffer.  [*Id.,* p. 10].  The log entry states:

> [H]e said they were going to sue because we weren't serious about this and we didn't make an offer for her husband.[I s]aid I thought his claim would be a derivative claim, and he said he didn't want to get ugly on this.  His demand remains policy limits as this is a case of inappropriate posturing.  Told him I understood we were at an impasse and based on my 3/15 Ltr would advance our initial offer.  Sent Initial Offer Ltr/draft.

---

[2] Lyons also asked Goss if the policy contained an arbitration clause and, when she said it did not, added, "Oh good, then it's a District Court action."  [*Id.,* p. 12].

[*Id.*].  Goss sent a letter with a $27,000 check that day.  [Dkt. #58, Ex. 5, 4/8/10].  The letter

stated:

> This payment is made in advance without prejudicing your right to receive
> a higher amount in the future through continuing negotiation or alternative
> means of resolution.
>
> Enclosed is our draft for $27,000.00 which represents the amount of our initial
> offer.  The remaining coverage available will be reduced by the amount of this
> payment and this amount will also be credited against any final determination
> of damages.

[*Id.*].  Due to the delay in obtaining release of Medicare liens, the check was reissued at the

request of Lyons over 10 months later, on February 23, 2011 (after this lawsuit was filed).  [Dkt.

#58, Ex. 1, 2/23/11 Letter from Goss to Lyons].  The cover letter states, in part:

> Per your request, payment is being issued in the amount of $27,000.00 in
> full settlement of your clients' Underinsured liability claim arising from
> this loss.

[*Id.*].  Goss sent the letter and check to John S. Gladd, State Farm's counsel, who (after a delay

of several weeks) had them hand-delivered to Lyons.[3]  Subsequently, on April 1, 2011, Gladd

sent Lyons a letter stating:

> This letter follows our telephone conversation of March 30, 2011.  We are in
> receipt of your letter of the same date.
>
> This letter is to confirm $27,000.00 paid by State Farm is not for a "full
> settlement".  The language Ms. Goss used in her February 23, 2011 letter is
> not accurate.  Please note she advises MSPRC[4] that the $27,000.00 being
> paid is "not final settlement."
>
> Our office received the checks as referenced.  As discussed, we did not hold
> the checks.  The undersigned simply did not see them until the day we
> hand-delivered them to your office.
>
> Further, as discussed, please let this letter serve as notice that the $27,000.00

---

[3] During oral argument, Gladd explained that he had been out of the office at that time because
of a medical crisis involving his son at Johns Hopkins.

[4] Medicare Secondary Payer Recovery Contractor

is being paid without prejudice to Plaintiff's contentions she is entitled to UM
benefits and damages consistent with the Petition filed on behalf of Mrs. Dunbar.

[Dkt. #59, Ex. 12, 4/1/11 Letter from Gladd to Lyons].

Goss testified she would have negotiated the claim further within her evaluation range,

but Lyons never counter-offered anything lower than the entire $200,000 UIM policy limits.

[Dkt. #56, Ex. 3, Goss Dep., 236:10-21].

Mrs. Dunbar was unable to testify as to any detail in her deposition due to memory

problems. [Dkt. #56, Ex. 6, Marye Dunbar Dep., 6:2-7:21]. She testified the accident has not

affected her relationship with her husband [*Id.,* 5:6-9], but plaintiffs contend that she has

cognitive deficits as a result of being hit by the car which prevent her from remembering how the

accident has affected her relationship with her husband.

Mr. Dunbar testified he did not know why he was personally suing State Farm. [Dkt.

#56, Ex. 7, Charles Dunbar Dep., 29:7-8]. He states that since Mrs. Dunbar's accident, he has to

do more of everything than he used to do, and to take care of his wife's medications.. [*Id.,*

39:12-40:7; Dkt. #58-2, Ex. 2, Claim Activity Log, Dunbar CL 006661]. He complains about

State Farm's delay in payment of the claim. [Dkt. #56, Ex. 7, Charles Dunbar Dep., 39:12-40:7].

However, he had no opinion about the amount plaintiffs should have been paid. [*Id.,* 40:8-18].

He does not blame State Farm for Medicare's delay in releasing more than $127,000 in funds.

[*Id.,* 40:23-41:10].

The Dunbars did not produce any medical records for health care received for any

emotional distress they claim in this suit.

During discovery in this litigation, counsel for State Farm sent multiple letters to

plaintiffs' counsel requesting information about Mrs. Dunbar's claim for ongoing medical issues

as a result of the accident. [Dkt. #56, Ex. 8, Gladd Letters to Lyons]. On the deadline for

plaintiff to provide expert reports, plaintiffs provided a letter to Lyons dated June 28, 2011, from

David E. Hansen, Ph.D., who performed a neurophsychological evaluation on Mrs. Dunbar.

[#58, Ex. 4, 6/28/11 Letter from David Hansen to Mark Lyons].[5]  Hansen concluded Mrs.

Dunbar suffers from "severe broad cognitive impairment (i.e. dementia) and major depressive

episode of mild severity." [*Id.,* p. 5].  Hansen opines that she "has experienced an exacerbation

of cognitive deficits and depression, and has developed the onset of numerous functional

difficulties, directly related to and/or caused by the accident and subsequent hip surgery." [*Id.*].

Medical records obtained by State Farm during its investigation indicate Mrs. Dunbar had

a history of weight loss, fatigue, depression and anxiety before the accident.  [Dkt. #59, Ex. 10].

Additionally, post-accident medical records showed improvement of some of these conditions.

[*Id.*].

On August 15, 2011, following receipt of the neuropsychological expert's report of June

28, 2011, State Farm paid the $173,000 balance of the UIM insurance limits   [Dkt. #56,

Defendant's Statement of Fact ¶33; Dkt. #58, Plaintiff's Response to Defendant's Statement of

Fact ¶33].

## II. Summary Judgment Standard

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where there is no genuine

issue of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

250 (1986); *Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an

---

[5] Dr. Hansen reviewed medical records from the date of the accident forward.  He did not review
medical records from before the accident. [Dkt. #58, Ex. 4, p. 1].

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material fact. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted). In its review, the court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker,* 164 F.3d 1249, 1251 (10th Cir. 1998). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### III. Analysis

### A. Breach of Contract Claim

State Farm asserts—and plaintiffs do not dispute—that its payment of the entire $200,000 in UIM limits renders moot the breach of contract claim. Therefore, State Farm is entitled to summary judgment on this claim.

### B. Claim for Breach of the Implied Duty of Good Faith and Fair Dealing

In *Christian v. American Home Assurance Co.,* 577 P.2d 899, 904 (Okla. 1977), the Oklahoma Supreme Court found that an insurer has a duty to deal fairly and in good faith with its insured, and a violation of that duty gives rise to an action in tort for consequential and, possibly,

punitive damages. A "clear showing" that the insurer acted unreasonably and in bad faith is necessary to show a breach of that duty. *Id.* at 905.

An insurer's refusal to pay is not unreasonable or in bad faith when there is a legitimate dispute concerning coverage. *Andres v. Oklahoma Farm Bureau Mut. Ins. Co.,* 227 P.3d 1102, 1107 (Okla. Civ. App. 2009) (citing, *inter alia, Christian*). "The decisive question is whether the insurer had a good faith belief, *at the time its performance was requested, that it had justifiable reason for withholding payment under the policy.*" *Duensing v. State Farm Fire & Cas. Co.,* 131 P.3d 127, 137-138 (Okla. Civ. App. 2006) (emphasis in original). The insurer's "knowledge and belief … during the time period the claim is being reviewed is the focus of a bad faith claim." *Id.* at 138 (citing *Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d 1105 (Okla. 1991)).

An insurer may withhold payment from its insured whenever it has a reasonable defense to the insured's claim based on its knowledge and belief. *Bailey v. Farmers Ins. Co.,* 137 P.3d 1260, 1264 (Okla. Civ. App. 2006) (citing *Manis v. Hartford Fire Ins. Co.,* 681 P.2d 760 (Okla. 1984)). This includes when the insurer and insured have legitimate disputes over the amount of coverage or the cause of loss. *Skinner v. John Deere Ins. Co.,* 998 P.2d 1219, 1223 (Okla. 2000). "Where an insurer has demonstrated a reasonable basis for its actions, bad faith cannot exist as a matter of law," and the insurer is entitled to summary judgment. *Beers v. Hillary,* 241 P.3d 285, 293 (Okla. Civ. App. 2010) (citing, *inter alia, Manis* at 761-62).

The Tenth Circuit stated the issue presented to a trial court on an insurer's motion for summary judgment in a bad faith lawsuit as follows:

> A jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct. On a motion for summary judgment, the trial court must first determine, under the facts of the particular case and as a matter of law, whether insurer's conduct may be reasonably perceived as tortious. Until the facts, when construed most favorably against the insurer, have established what

12

might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed.

*Oulds v. Principal Mutual Life Ins. Co.,* 6 F.3d 1431,1436-37 (10th Cir. 1993).

Plaintiffs contend State Farm acted in bad faith because it improperly investigated plaintiffs' claims; failed to make timely payment on the claims; and failed to properly evaluate plaintiffs' damages and issue payment within its legitimate settlement range. Plaintiffs also complain that the February 23, 2011 from State Farm to Lyons was "a trick State Farm used to get the check signed that would have been subject to the letter agreement of full settlement of the claim." [Dkt. #58 at 9]. Due to the overlapping nature of plaintiffs' claims regarding investigation, evaluation and payment of plaintiffs' claim, the court addresses those claims collectively below. Additionally, plaintiffs contend State Farm treated Mr. Dunbar in bad faith with respect to his consortium claim.

### 1. Investigation/Evaluation/Payment of Claims

Plaintiffs contend State Farm failed to properly investigate and evaluate their claims. Specifically, they contend the insurer should have taken their recorded statements earlier and contacted their health care providers to inquire further about their conditions rather than merely relying on Mrs. Dunbar's medical records. Additionally, they assert State Farm acted in bad faith by failing to provide plaintiffs' counsel with "information regarding the valuation standards and methods" used to value their claims.

"When a bad faith claim is premised on inadequate investigation, the insured must make a showing that material facts were overlooked or a more thorough investigation would have produced relevant information." *Timberlake Constr. Co. v. U.S.F. & G. Co.,* 71 F.3d 335, 345 (10th Cir. 1995) (applying Oklahoma law). The insurer's investigation does not need to be perfect, but "reasonably appropriate under the circumstances." *Sims v. Great Am. Life Ins. Co.,*

13

469 F.3d 870, 891 (10th Cir. 2006) (quoting *Buzzard v. Farmers Ins. Co.,* 824 P.2d 1105, 1109 (Okla. 1991)). "An investigation does not meet this standard where (1) the manner of investigation hints at a sham defense or otherwise suggests that material facts were overlooked, or (2) the insurer intentionally disregarded undisputed facts supporting the insured's claim." *Id.* (citing *Oulds,* 6 F.3d at 1442).

State Farm began its investigation of the UIM claim as soon as it became aware, on June 2, 2009, that Mrs. Dunbar was pursuing a claim under the UIM insurance policies. Plaintiffs' attorney did not pursue a loss of consortium claim on behalf of Mr. Dunbar until February 5, 2010. The Claim Service Log establishes that after the UIM claim file was opened, Goss worked diligently to obtain medical records pertaining to Mrs. Dunbar's surgery and subsequent physical therapy. She did not receive the last of the medical records until February 17, 2010. In the interim, she made calls to Mrs. Dunbar to ascertain the progress of her treatment. During a September 8, 2009 call, Mrs. Dunbar told her that she was done with physical therapy, no longer used a walker and had returned to her volunteer activities.

Each time Goss received material information from Mrs. Dunbar or medical records during the course of the investigation, she performed a re-evaluation of the claim, and she raised the evaluation range each time. When plaintiffs' attorney asserted the medical records did not accurately reflect Mrs. Dunbar's level of post-accident activity, Goss took Mr. Dunbar's statement on this subject, and on his newly-asserted consortium claim. Immediately thereafter, she amended her evaluation of the entire UIM claim. Additionally, during the pendency of this lawsuit, State Farm's counsel repeatedly requested information from the Dunbars' attorney concerning Mrs. Dunbar's claim of ongoing medical problems as a result of the accident. Not until late July 2011 did plaintiffs' counsel produce evidence of such problems, in the form of the

14

neuropsychology expert's report.

Plaintiffs cite no authority for the proposition that State Farm should have contacted medical providers to discuss their condition, nor for the allegation that it was required to turn over standards used for valuations. The court finds that State Farm's investigation and valuation of the claims was reasonable.

Additionally, plaintiffs contend State Farm acted in bad faith by not including future medical expenses in its valuation of their claim. However, in light of the medical records State Farm received and reviewed, the court finds the insurer did not act unreasonably in reaching this conclusion.

Plaintiffs also assert State Farm's January 5, 2010, offer of $2,500 was a "low ball" offer. Under Oklahoma law, the duty of an insurer to make a timely payment on a UIM claim is triggered when the insurer's investigation of the claim leads to an evaluation that the insured's total claim likely exceeds the amount of underlying liability insurance. *Reeder v. American Economy Ins. Co.,* 88 F.3d 892, 894 (10th Cir. 1996) (quoting *Buzzard v. Farmers Ins. Co., Inc.,* 824 P.2d 1105, 1112 (Okla. 1991)). A claim for bad faith delay in payment only exists after the insurer determines that its entire UIM evaluation range exceeds the underlying amount of liability insurance and either fails to make any payment or offers payment under that range. *See Roberts v. State Farm Mut. Auto Ins. Co.,* 61 Fed. Appx. 587, 592 (10th Cir. 2003) (unpublished opinion) (citing *Newport v. USAA,* 11 P.3d 190, 196-97 (Okla. 2000).

In *Garnett v. GEICO,* 186 P.3d 935 (2008) and quite recently in *GEICO v. Quine,* --- P.3d---, 2011 WL 5045216 (Okla.), the Oklahoma Supreme Court addressed the question of whether an insurer may delay payment while the parties legitimately dispute the amount of UIM coverage that should be paid.

In *Garnett,* the underlying limit of liability insurance available was $10,000 and plaintiff had a UM/UIM policy with a $15,000 limit. Shortly after the plaintiff made demand on both policies, the UIM adjuster evaluated the plaintiff's total claim at a range of $11,000 to $13,000 and offered $1,000 on the UIM policy (i.e., the minimum evaluation of $11,000 minus the $10,000 in liability limits available to the plaintiff). The adjuster later raised that offer to $2,000 and then to $3,000 after the plaintiff insisted on collecting the entire $15,000 in UIM coverage. 186 P.3d at 938-939. The plaintiff demanded the $3,000 payment be made as an "undisputed amount," which GEICO refused to do. *Id.* The trial court granted GEICO summary judgment on the "bad faith" claim, and a jury later determined plaintiff was entitled to $5,000 in UIM benefits. On appeal, the Oklahoma Supreme Court held the "UIM claim was legitimately disputed," and therefore the trial court "did not err by granting summary judgment to the insurer on the bad faith claim." *Id.* at 944.

In *Quine,* multiple parties, including nine-year-old Amanda Watkins, were injured in a three-car accident in 2005. 2011 WL 5045216 at *1. Watkins was riding in a car driven by her mother, Tracie Quine. Medical bills for her injuries totaled $9,904.05. These were the only economic or out of pocket damages she incurred. Jeffrey Quine had an automobile insurance policy issued by GEICO which included UIM benefit with limits of $100,000 per person and $300,000 per occurrence. *Id.* The tortfeasor's liability insurance policy was insufficient to satisfy all of the claims asserted. Watkins settled her personal injury claim with the tortfeasor for the sum of $13,890, which as paid to Watkins in August 2007. *Id.* Thus, the liability insurer fully compensated plaintiff for her economic damages. Plaintiff's UIM claim sought only non-economic damages such as pain and suffering and physical impairment. Watkins and GEICO were unable to reach a full and complete resolution of the UIM claim, and Watkins' attorney

presented a demand seeking an unconditional tender of the "undisputed amount" of benefit under

the policy. No specific dollar figure was identified by Watkins' attorney as representative of the

"undisputed amount." *Id.* at *2. GEICO rejected this proposal and contended it had no

obligation to pay UIM benefits in advance without a complete release. Subsequently, GEICO

fled a declaratory judgment action in the U.S. District Court for the Western District of

Oklahoma, and asked the court to enter an order determining that "neither GEICO's insurance

policy nor Oklahoma law require[d] GEICO to pay to its insured what she referred to as the

'undisputed amount.'" *Id.* Watkins filed a counterclaim for bad faith breach of the insurance

contract. *Id.* The federal district court certified to the state supreme court the following

question:

> Does an insurer's refusal to unconditionally tender partial payment of UIM
> benefits amount to a breach of the obligation to act in good faith and deal
> fairly when (1) the insured's economic/special damages have been fully
> recovered through tortfeasor's liability insurance; (2) the insurer promptly
> investigates and places a value on the claim; (3) there is a legitimate dispute
> regarding insured's noneconomic/general damages; and (4) benefits due have
> not been firmly established?

*Id.* at *1. The Oklahoma Supreme Court answered in the negative, stating:

> [W]e conclude that an insurer's refusal to unconditionally tender a partial
> payment of UIM benefits does not amount to a breach of the obligation
> to act in good faith and deal fairly when: (1) the insured's economic/special
> damages have been fully recovered though payment from the tortfeasor's
> liability insurance; (2) after receiving notice that the tortfeasor's liability
> coverage has been exhausted due to multiple claims, the UIM insurer
> promptly investigates and places a value on the claim; (3) there is a
> legitimate dispute regarding the amount of noneconomic/general damages
> suffered by the insured; and (4) the benefits due and payable have not
> been firmly established by either an agreement of the parties or entry of
> a judgment substantiating the insured's damages.

*Id.* at *5.

17

In this case, it is undisputed the insured's economic damages were fully recovered through payment from the tortfeasor's liability insurance. As discussed above, State Farm promptly investigated and placed a value on the claim. There was a legitimate dispute regarding the amount of noneconomic/general damages suffered by the insured, in part because plaintiffs did not provide evidence that Marye Dunbar had ongoing medical issues as a result of the accident until well after the lawsuit was filed.[6] Moreover, the benefits due and payable were not firmly established by an agreement of the parties. Applying the Oklahoma Supreme Court's holding in *Quine,* the court concludes State Farm was not obligated to tender payment of plaintiffs' claim.

The court also rejects plaintiffs' contention that State Farm attempted to "trick" them into accepting the reissued check for $27,000 in full settlement of their claim. In its initial tender of the payment, State Farm expressly acknowledged the payment was without prejudice to receive a higher amount in the future. The check was reissued during the pendency of this lawsuit because of delays caused by the Medicare lien. After the "full settlement" language was called to his attention, Gladd clarified that language was in error, and that the $27,000 was being paid without prejudice to plaintiffs' right to seek additional amounts and damages as set forth in their petition. The error in the cover letter appears to have been the result of the mistaken use of a form letter. Additionally, while evidence of an insurer's litigation conduct may, in some rare instance, be admissible on the issue of bad faith, such evidence is generally inadmissible, as it lacks probative

---

[6] Plaintiffs contend State Farm's offer to settle the total UIM policy claim for $27,000 was a "low ball" offer. The court disagrees. An insurer has the right to dispute "elements of damages claim such as pain and suffering and permanent disability." *Reeder,* 88 F.3d at 896. A legitimate disagreement as to the claim amount, without any evidence of purposeful "low balling," does not amount to "bad faith." *See Skinner,* 998 P.2d at 1223; *Sims,* 16 P.3d at 471.

18

value and carries a high risk of prejudice. *Timberlake Construction Co. v. U.S.F. & G. Co.,* 71 F.3d 335, 341 (10th Cir. 1995).

### 2. Consortium Claim

Plaintiffs contend State Farm acted in bad faith by not advising Mr. Dunbar he had a loss of consortium claim, and in not timely investigating or valuing the claim. Plaintiff cites no authority for the proposition that State Farm was required to advise Mr. Dunbar he had a claim for loss of consortium. Further, State Farm was unaware Mr. Dunbar was asserting such a claim until Lyons' letter of February 5, 2010—more than seven months after State Farm opened its UIM claim file.

Goss testified that after she received Lyons' February 5, 2010 letter, she viewed Mr. Dunbar's consortium claim as "derivative" of Mrs. Dunbar's consortium claim. This is a correct statement of Oklahoma law. *See Littlefield v. State Farm Fire & Cas. Co.,* 857 P.2d 65, 68 (Okla. 1993). She testified she valued the consortium claim by updating and raising her evaluation on March 3, 2010, and her $27,000 settlement offer to plaintiffs' counsel the same day. [Dkt. #56, Ex. 3, Goss Dep., 75:15-76:16, 117:6-18].

The court finds and concludes State Farm did not act in bad faith with respect to Mr. Dunbar's consortium claim.

### IV. Conclusion

For the reasons set forth above, defendant State Farm's Motion for Summary Judgment [Dkt. # 56] is hereby granted.

19

ENTERED this 23rd day of November, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma